960 F.2d 150
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
RUBBER TECHNOLOGY, INC., Plaintiff-Appellee,
v.
AMPLAN, INC., Defendant-Appellant.
 No. 91-5756.
 United States Court of Appeals, Sixth Circuit.
 April 13, 1992.
 
 Before BATCHELDER, Circuit Judge, LIVELY, Senior Circuit Judge, and TAYLOR, District Judge.*
 PER CURIAM.
 
 
 1
 The defendant in this diversity case appeals from a money judgment for the plaintiff entered by the district court following a bench trial. Upon consideration of the briefs and oral arguments of counsel together with the record on appeal, we find no reversible error and will affirm the judgment.
 
 
 2
 The dispute concerns a machine manufactured by the defendant to be used in the production of urethane for casting. The defendant has manufactured a urethane machine known as a "Flying Wedge" for a number of years and, at the plaintiff's request, furnished a quotation for such a machine on April 14, 1989. The plaintiff issued a written purchase requisition for the Flying Wedge and related components in May 1989. When the machine was delivered by the defendant to the plaintiff at its plant in Tennessee on November 4, 1989, it was found to be damaged and inoperable. The machine was sent back to the defendant in New Jersey for repairs on November 8, 1989. The district court found that the damage to the machine in the original shipment from New Jersey to Tennessee was caused by the defendant's failure to crate it properly. For this reason, the district court dismissed from this action with prejudice the trucking company that transported the machine. That dismissal has not been appealed.
 
 
 3
 The defendant repaired the machine at its plant in New Jersey and transported it back to the plaintiff's plant in Tennessee in January 1990.
 
 
 4
 After the Flying Wedge had been installed, plaintiff's employees, with the help of the defendant's technical service manager, started the machine and attempted to create "urethane rolls." There were problems from the beginning and witnesses for the plaintiff testified that they and the employees of the defendant were unable to produce any commercially acceptable rolls. The finished urethane castings contained "flow lines" which made them unacceptable. The evidence established without contradiction that the Flying Wedge delivered to the plaintiff was the first and only version of that machine ever produced or sold by the defendant. Unlike earlier models, the Flying Wedge sold to the plaintiff was described as a "double action, push-pull machine" using a hydraulic drive. Earlier versions of the Flying Wedge were single action machines using an air cylinder drum rather than hydraulic action.
 
 
 5
 The defendant's representatives replaced numerous parts of the machine, including the programmable controller, a computerlike device that coordinates timing functions. The defendant's technical service manager made four trips to the plaintiff's plant in Tennessee in an effort to determine the cause of the machine's failure to produce commercially acceptable urethane rolls. Several witnesses described the basic problem with the machine as operating in such a way that plaintiff's employees could not achieve a consistent ratio between the basic ingredient, a resin, and the other ingredient in the process, described as a "hardener." The defendant's president testified that a resin and hardener are mixed in urethane production and that the proper chemical action must take place for the ingredients to become urethane.
 
 
 6
 The defendant's witnesses attempted to demonstrate that the problems with the urethane produced by the double action, push-pull Flying Wedge were caused by the plaintiff's employees' failure to follow directions in preheating the resin before it was fed into the machine. Various witnesses for the defendant, including one who qualified as an expert, testified that preheating the resin at too high a temperature would cause a degrading effect that in turn would interfere with the proper operation of the machine. The district court found that this new, first-of-a-kind Flying Wedge was never capable of producing commercially acceptable urethane rolls, despite all efforts to make it work. The evidence fully supports this finding and thus it is not clearly erroneous.
 
 
 7
 Amplan makes two arguments on appeal: (1) the district court did not hold Rubber Tech to the required burden of proof and the evidence failed to establish the existence of a defect that proximately caused the damage complained of; and (2) the district court erred in refusing to enforce an agreement between these commercial parties to limit the purchaser's remedies to repairing or replacing a defective product. We reject both contentions.
 
 
 8
 In oral argument counsel for Amplan asserted that the district court treated this as a strict liability case, requiring the plaintiff to prove no more than the fact that the double action, push-pull Flying Wedge did not work. The record and the district court's memorandum opinion totally refute this argument. The district court noted that the machine delivered to Rubber Tech was the first double action, push-pull machine Amplan had ever produced or sold, none had been produced or sold since, and Amplan never attempted to operate the machine or make a ratio check prior to shipping. These facts led to the "inescapable conclusion" that the Flying Wedge never worked properly and that the defendant was unable to identify and remedy the problems so it would operate properly and make commercially acceptable urethane products. It is clear that the district court required Rubber Tech to establish more than the mere fact that the machine did not conform to Amplan's representations or to Rubber Tech's needs. Because Amplan's technical experts could not themselves discover the precise cause of the failure of the machine to operate properly, it is clear that Rubber Tech had no burden of producing such pinpointed evidence. The evidence of its nonoperability was overwhelming. This argument by Amplan, stripped of its verbiage, is actually nothing more than a contention that the district court's findings of fact are clearly erroneous.
 
 
 9
 The district court also found that the machine clearly did not conform and that after accepting the machine and paying for it in full, Rubber Tech effectively revoked its acceptance within a reasonable time after all efforts to make it conform failed. See TENN.CODE ANN. § 47-2-608. Amplan's technical service manager made four trips to Rubber Tech's facility over a period of several months and was never able to identify the precise cause of the machine's failure to conform, though he removed and replaced numerous critical parts including the ratio lockout valve and the programmable controller. In the end Amplan's service manager removed the hydraulic drive mechanism and replaced it with an air cylinder drum of a type which had been used on all previous Flying Wedges. Even these fundamental changes in the machine did not cure the problems.
 
 
 10
 With respect to the second argument, the district court found that the limitation of remedies originally agreed to by the parties was not binding on Rubber Tech because it failed of its essential purpose. In other words, after weeks of attempting to cure the problem by replacing and repairing parts, the purchaser still did not have an operable machine. Amplan's unsuccessful efforts to repair the machine within a reasonable time created a backlog of unfilled orders for Rubber Tech and the prospect of the loss of business. Under these circumstances, the district court found, any exclusion of consequential damages would be "unconscionable." The court specifically found that Rubber Tech was the victim of unfair surprise in purchasing an untested machine that was represented as having capabilities that were actually unproven and evidently unobtainable. TENNESSEE CODE ANN., § 47-2-719 provides that an agreement may limit a seller's recovery unless circumstances cause such limited remedy to fail of its essential purpose. The statute further provides that consequential damages may be limited or excluded unless such limitation or exclusion is unconscionable. We conclude that the district court correctly applied the governing statute, found the limitation unconscionable under the facts of this case, and awarded monetary damages to Rubber Tech.
 
 
 11
 The judgment of the district court is affirmed.
 
 
 
 *
 The Honorable Anna Diggs Taylor, United States District Judge for the Eastern District of Michigan, sitting by designation